No. 27,326.

THE FIRST STATE BANK OF KANSAS CITY, *Appellant*, v. ROY L. BONE
as Bank Commissioner of the State of Kansas, *Appellee*.

SYLLABUS BY THE COURT.

1. BONDS—*What Constitutes*. Certain instruments are examined and held to
   be bonds within the meaning of our statute (Laws 1925, ch. 85) pertaining
   to banks.
2. BANKS AND BANKING—*Authority to Buy and Sell Bonds*. State banks have
   no authority under the statute (Laws 1925, ch. 85) to buy and sell, nor to
   invest their assets in, bonds of a kind not named in the statute.

Appeal from Shawnee district court, division No. 1; JAMES A. McCLURE,
judge. Opinion filed January 8, 1927. Affirmed.

*H. J. Smith*, of Kansas City, *J. D. M. Hamilton*, of Topeka, and *John F.
Rhodes*, of Kansas City, Mo., for the appellant; *Ralph T. O'Neil*, of Topeka,
*Justin D. Bowersock* and *Robert B. Fizzell*, both of Kansas City, Mo., of
counsel.

*Charles B. Griffith*, attorney-general, *John G. Egan* and *Roland Boynton*,
assistant attorneys-general, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action to enjoin the defendant from car-
rying out his order directing plaintiff to remove certain instruments
from its assets within thirty days, for the reason that they are not
legal investments for state banks. The trial court sustained a de-
murrer to plaintiff's petition on the ground that it did not state facts
sufficient to constitute a cause of action. Plaintiff has appealed.

Plaintiff alleges, in substance, that it is a state bank, chartered
November 10, 1890, for a term of fifty years, for the following pur-
poses, as set forth in its charter:

"That the purposes for which this corporation is formed are to carry on the
business of receiving money on deposit, and to allow interest thereon, and of
buying and selling exchange, gold, silver, coin, bullion, uncurrent money,
bonds of the United States and of any state, county, township, school district,
city or any other bonds and warrants; of loaning money on real estate, per-
sonal and collateral security, and of discounting negotiable notes and notes
not negotiable; and on all loans made may keep and receive the interest in
advance, and may do a general banking business."

That on January 2, 1926, in the ordinary conduct of its business

Banks and Banking, 7 C. J. p. 594 n. 93; 3 R. C. L. 383. Bonds, 9 C. J.
p. 7 n. 1.

it did, from its assets, buy a first mortgage, collaterally secured, serial six per cent gold note of one John H. Kirby in the principal sum of $1,000, dated April 1, 1925, due February 1, 1927, and numbered 506 of the series.

This instrument is in the following form:

"Number 506          UNITED STATES OF AMERICA        Dollars
STATE OF LOUISIANA        1000

FIRST MORTGAGE COLLATERALLY SECURED

Six Per Cent (6%) Serial Gold Note of

JOHN H. KIRBY

OF HOUSTON, TEXAS.

"For value received, John H. Kirby, a resident of the city of Houston, state of Texas, hereinafter referred to as the 'maker,' promises to pay to bearer, or, if registered, to the registered holder hereof, at the office of Whitney-Central Trust and Savings Bank, in the city of New Orleans, state of Louisiana, or, at the option of the holder, at the office of Illinois Merchants Trust Company, in the city of Chicago, state of Illinois, on the first day of February, 1927,

"ONE THOUSAND DOLLARS ($1,000)

in the United States gold coin of or equal to the present standard of weight and fineness, and to pay in like gold coin, interest at the rate of six per cent (6%) per annum thereon until paid, payable semiannually on the first day of August, 1925, and upon the first day of February and of August in each year thereafter until the maturity hereof, said interest being payable only upon presentation and surrender, as they severally mature, of the respective coupons for such interest hereto attached, at the office of the Whitney-Central Trust and Savings Bank in the city of New Orleans, state of Louisiana, or, at the option of the holder, at the office of Illinois Merchants Trust Company, in the city of Chicago, state of Illinois.

"This note is one of an issue of notes aggregating four million dollars ($4,000,000) face value of principal, all issued under and in accordance with, and all equally secured by a mortgage and collateral trust agreement with which this note is paragraphed for identification, executed by the maker to the Whitney-Central Trust and Savings Bank of New Orleans, Louisiana, as trustee, to which said mortgage and collateral trust agreement reference is hereby made for a description of the securities pledged and hypothecated, the nature and extent of the security, the rights of the holders of said notes thereunder, the terms and conditions upon which said notes are issued and secured, and the numbers, denominations and maturities thereof.

"This note is transferable by delivery unless registered upon the books kept for that purpose by the Whitney-Central Trust and Savings Bank, trustee, in the city of New Orleans, state of Louisiana, and registration noted hereon, after which no valid transfer can be made except on said books, until after it is discharged from registry upon the books of the trustee and made payable to bearer. After such discharge from registry this note shall again be transferable

First State Bank v. Bone.

by delivery, and thereafter it shall continue subject to successive registrations and transfers to bearer as before. The attached coupons shall always be transferable by delivery, whether this note be registered or not.

"If default be made in the payment of the principal hereof, or any installment of interest hereon, or any part thereof, or in the performance or observance of any of the covenants and agreements in said mortgage and collateral trust agreement, then the principal of this note may, prior to the expressed maturity hereof, be declared and caused to become due and payable in the manner and at the time or times, and with the effect as provided in said mortgage and collateral trust agreement.

"Payment of any one or more or all of the notes of this issue may be anticipated by the maker on any semiannual interest payment date upon payment of the principal together with interest to date of payment and on complying with the provisions of said mortgage and collateral trust agreement with reference thereto, including the payment of a premium of ——% of the principal if the anticipated payment is made on or prior to February 1, 19—, a premium of ——% of the principal if the anticipated payment is made between August 1, 19—, and August 1, 19—, both inclusive, and a premium of ——% of the principal if the anticipated payment is made between February 1, 19—, and August 1, 19—, both inclusive. These premiums are not cumulative but are exclusive one of the other.

"This note shall not become valid and binding upon said maker until the Whitney-Central Trust and Savings Bank, trustee, under said mortgage and collateral trust agreement, shall have signed the certificate indorsed hereon.

"In witness whereof, the said John H. Kirby has signed this note and caused the attached interest coupons to be executed with his printed or engraved facsimile signature, in the city of New Orleans, Louisiana, as of the first day of April, 1925.

                                        (Signed)     John H. Kirby."

Interest coupons for each six months' interest were attached.

The above instrument and other like instruments of the series were issued in accordance with and equally secured by a mortgage and collateral trust agreement executed by the maker to the Whitney-Central Trust and Savings Bank of New Orleans, Louisiana, as trustee. It is collaterally secured by certain Kirby Lumber Company first-mortgage six per cent sinking-fund gold bonds, executed by the Kirby Lumber Company, a corporation, created under the laws of Texas, in the total sum of $5,000,000, dated July 16, 1923, payable July 16, 1938, bearing six per cent interest, which bonds are secured by a deed of trust executed by the Kirby Lumber Company to the Millers Bank of Wilkes-Barre, Pa., as trustee, and under which the Whitney-Central Trust and Savings Bank of New Orleans has been substituted as trustee. The mortgage and collateral trust agreement contains articles, with appropriate sections and subdi-

visions thereof, pertaining to the notes, their issue and their authentication; the specific covenants of John H. Kirby; payment and cancellation prior to default; the redemption of notes prior to their due date; the securities pledged and mortgaged; the release of securities pledged and mortgaged; the enumeration of events constituting default; provisions in case of default; the compensation and duties of the trustee; the noteholder's rights to sue; construction under the laws of Louisiana, and the acceptance by the trustee, all treated at length and with such particularity that they cannot be set out in full.

Plaintiff further alleged that on January 2, 1926, in the ordinary conduct of its banking business, it did, from its assets, buy a serial 5½ per cent gold note of the Dierks Lumber and Coal Company, a corporation organized under the laws of Nebraska, in the principal sum of $1,000, dated February 1, 1925, due February 1, 1927, being number 234 of the series, a copy of which instrument is as follows:

"No. 234         UNITED STATES OF AMERICA         $1,000
STATE OF NEBRASKA

DIERKS LUMBER AND COAL COMPANY
SERIAL 5½% GOLD NOTE
Due February 1, 1927.

"Dierks Lumber and Coal Company (hereinafter called the 'company'), a corporation of. the state of Nebraska, for value received, promises to pay to the bearer, or if registered, to the registered owner hereof, on the first day of February, 1927, the principal sum of

"ONE THOUSAND DOLLARS ($1,000)

and to pay interest thereon from the first day of February, 1925, at the rate of five and one-half per cent less (5½%) per annum semiannually on the first days of February and August in each year until this note shall have been paid in full, but only upon presentation and surrender of the coupons hereto annexed as they severally mature. Both the principal of and interest on this note are payable at the principal office of The Coal and Iron National Bank of the city of New York, in the borough of Manhattan, city and state of New York, in gold coin of the United States of America of or equal to the standard of weight and fineness in effect on the first day of February, 1925, without deduction from principal or interest for any federal normal income tax not exceeding 2% in any year which the company or the trustees herein mentioned may be required or permitted to pay thereon or retain or deduct therefrom under any present or future law of the United States of America.

"As provided in the indenture hereinafter mentioned, the company will reimburse to the holder, or if registered, to the registered owner hereof, the Maryland securities tax not exceeding 4½ mills per annum on each dollar of assessed value hereof, or the Pennsylania personal property tax not exceeding 4 mills per annum on each dollar of nominal value hereof, or the Connecticut

First State Bank v. Bone.

personal property tax or exemption tax not exceeding in any one year 4 mills on each dollar of the principal amount hereof, or the Massachusetts income tax not exceeding 6% per annum on the income received from or on this note, which may be legally assessed upon such holder or registered owner by reason of his ownership hereof and paid by him, but in any case only upon delivery to the company of written application for reimbursement within sixty days after the payment of said tax (or in case of prepayment of said Connecticut tax, within 60 days after the original and each anniversary date of such prepayment) as provided in said indenture.

"This note is one of an authorized issue of notes of the company known generally as its serial gold notes issued and to be issued in one or more issues to an amount not exceeding in the aggregate the principal sum of five million dollars ($5,000,000) at any one time outstanding, all under and equally entitled to the benefits and subject to the provisions of an indenture dated the first day of February, 1925, executed by the company to The Coal and Iron National Bank of the city of New York, as trustee, to which indenture reference is hereby made for a statement of the terms and conditions upon which the notes are issued and the rights and obligations of the company, the trustee and the respective holders of the notes. As provided in said indenture, said notes are issuable in one or more issues, which may vary as to date, dates of maturity and rate of interest. This note is one of an issue for the aggregate principal amount of three million dollars ($3,000,000), dated the first day of February, 1925, and entitled 'serial 5½% gold notes.' The notes of said issue mature serially as follows: $650,000 principal amount on February 1, 1927, $650,000 principal amount on February 1, 1928, and $850,000 principal amount on February 1, 1929, and $850,000 principal amount on February 1, 1930.

"This note is redeemable at the option of the company on any interest-payment date upon notice as provided in said indenture at 100½% of the principal amount thereof, plus accrued interest thereon to the date set for redemption.

"This note shall pass by delivery unless registered as to principal in the name of the owner on the books of the company at the principal office of the trustee in the borough of Manhattan, city and state of New York, such registration being noted hereon. After such registration no transfer hereof shall be valid unless made on said books by the registered owner in person or by duly authorized attorney, and similarly noted hereon; but this note may be discharged from registry by being in like manner transferred on said books to bearer and thereupon transferability by delivery shall be restored; and this note may again from time to time be registered or transferred to bearer as before. Such registration shall not affect the negotiability of the coupons attached hereto, which shall continue to be payable to bearer and transferable by delivery.

"As provided in said indenture, notes of the denominations of $1,000 and $500 at any time outstanding, when surrendered with all unmatured coupons attached and upon payment of charges, if required, may be exchanged for an equal aggregate principal amount of notes of the same tenor and maturity of

the other denomination of numbers not contemporaneously outstanding, with all unmatured coupons attached.

"In case an event of default as defined in said indenture shall happen, the principal of all the notes of all issues may be declared, or may become, due and payable before maturity in the manner and with the effect provided in said indenture.

"No recourse shall be had for the payment of the principal or interest on this note or of any part hereof, or for any claim based hereon or·thereon or otherwise in any manner in respect hereof or in respect of said indenture, to or against any incorporator, stockholder, officer or director, past, present or future of the company, or of any predecessor or successor corporation, either directly or through the company or such predecessor or successor corporation, whether by virtue of any constitution or statute or rule of law, or ·by the ·enforcement of any assessment or penalty, or in any manner, all such liability being expressly waived and released by the acceptance hereof and as part of the consideration for the issue hereof.

"This note shall not be valid or become obligatory for any purpose until authenticated by the execution by the trustee of the certificate indorsed hereon.

"In Witness Whereof, the company has caused this note to be executed in its corporate name, by its president or a vice president and its corporate seal to be hereto affixed, duly attested by its secretary or an assistant secretary, and coupons for interest to be attached hereto bearing the facsimile signature of its treasurer, all in the city and state of New York, as of the first day of February, 1925.                    DIERKS LUMBER & COAL COMPANY,

By H. L. DIERKS, *Vice President.*"

Attest: DE VERE DIERKS, *Secretary.*

Interest coupons for each six months' interest were attached.

As security for the payment of this instrument and others of the series the Dierks Lumber and Coal Company issued an indenture February 1, 1925, with Coal and Iron National Bank of the city of New York as trustee, whereby it obligated itself not to encumber further the assets of the Dierks Lumber and Coal Company, which are shown by the indenture to be far in excess of the amount of the notes issued.

The indenture contains appropriate articles, with sections and subdivisions thereof, pertaining to the notes, their issue, the security, the payment or redemption of the notes, the release of the security, the duties and compensation of the trustee, the formation and consolidation of subsidiary companies, events of default and proceedings thereafter, construction under the laws of New York, and the acceptance of the trustee at length and with such particularity that we cannot set them out in full.

It was further alleged that on January 6, 1926, defendant, being

First State Bank v. Bone.

advised plaintiff had purchased these instruments, wrote plaintiff as follows:

"The attorney-general has held that these are not legal investments for state banks and you are hereby directed to remove same from the assets of your bank within thirty days."

Plaintiff alleged that it is advised and believes that the instruments above mentioned are legal investments for state banks in this state, and that the investments were made as a part of its ordinary banking business and under the powers granted to it by its charter and the statutes of the state; that plaintiff must invest in such notes in order to make earnings on its investments, capital, surplus and deposits, and that if it is required to dispose of the notes herein set out and to refrain from investing in such notes hereafter, irreparable injury will be caused to its business which it is permitted to do under its charter and under the statute, for which it has no adequate remedy at law, etc.

Defendant's demurrer to plaintiff's petition raised the question whether it is legal for state banks to invest in the instruments above mentioned. The prudence of the investment, or the soundness of it from a financial viewpoint, are not in controversy here. The sole question before us is whether the law permits state banks to invest in instruments of this character. Our statute (R. S. 9-101, as amended by Laws of 1925, ch. 85), necessary to be considered in determining the question, reads as follows:

"Any five or more persons may organize themselves into a banking corporation, and shall be permitted to carry on the business of receiving money on deposit and to allow interest thereon, giving to the person depositing credit therefor; and of buying and selling exchange, gold, silver, foreign coin, bullion, uncurrent money, bonds of the United States, bonds of the state of Kansas, bonds of land banks organized under the federal farm-loan act and authorized to make loans secured by first mortgages on Kansas farm lands, bonds and warrants of cities, counties and school districts in the state of Kansas, and state, county, city, township and school bonds issued in other states of the United States than Kansas, of loaning money on real estate, chattel and personal security at a rate of interest not to exceed the legal rate allowed by law; of discounting negotiable notes and of notes not negotiable, and to own a suitable building, furniture and fixtures for the transaction of its business, of the value not to exceed one-half of the capital and surplus of such banks: *Provided,* That nothing in this section shall prohibit such bank from holding and disposing such real estate as it may acquire through the collection of debts due it."

Our statute has not always been as above quoted, but is the result

of several amendments of our general banking act of 1891 (Laws of 1891, ch. 43). This authorized banking associations to buy and sell "bonds of the United States, of the state of Kansas, and of the city, county and school district in which any association shall be organized." This was repealed and a new banking statute enacted by chapter 47, Laws 1897, which authorized banks to buy and sell "bonds of the United States and of the state of Kansas, and bonds and warrants of cities, counties, and school districts in the state of Kansas." That was amended by chapter 79, Laws 1917, so that banks were authorized to buy and sell "bonds of the United States and of the state of Kansas, and bonds and warrants of cities, counties, and school districts in the state of Kansas, and state, county, city, township and school bonds issued in other states of the United States than Kansas." The legislative history of this change should be noted. In the bill which created it (senate bill No. 123), these words were added: "together with such corporate bonds as shall be approved for that purpose by the bank commissioner of the state of Kansas," and as so worded it passed the senate. The house amended the bill by striking out the words last quoted, and the senate concurred in the amendment. The statute as enacted in 1917 became R. S. 9-101. This was amended by chapter 85, Laws 1925, so as to include "bonds of land banks organized under the federal farm loan act and authorized to make loans secured by first mortgages on Kansas farm lands." So the entire history of our legislation upon this question shows a constant enlargement of authority as to the kinds of bonds banks might buy and sell.

The argument of appellant is grouped about two questions: *First*, are the instruments above set out bonds or notes within the meaning of our statute (Laws 1925, ch. 85)? *Second*, if they are bonds, then are Kansas state banks, under our statute (Laws 1925, ch. 85) prohibited from investing their assets therein?

A bond, as the term is here used, whether issued by the United States government, the state, or some governmental subdivision thereof, or by a private corporation, a partnership or an individual, is a written instrument which includes within its terms the promise by the maker to pay to bearer, or to a person named, or designated therein, or his order, a named sum of money, usually with interest at a named rate, at a fixed, or determinable future time. It may, or may not be secured by a lien upon specific real or personal property.

First State Bank v. Bone.

It therefore contains the elements of an ordinary promissory note. Yet our statute, defining the business in which a banking corporation may engage (Laws 1925, ch. 85, *supra*), clearly distinguishes bonds —at least those issued by the United States, or by the states and governmental subdivisions thereof—from notes; for, had the legislature intended to authorize state banks to buy and sell, or to invest their assets in, bonds as freely as they could buy and sell or invest in notes, there would have been no purpose in mentioning bonds, or any particular kind or kinds of bonds, in the statute. Yet the distinction between bonds and notes, as those terms are used in financial business, is not always easy to draw. Generally speaking, the term "bond" is given to those evidences of indebtedness issued by the United States, the state, or any governmental subdivision thereof. These, in addition to containing a promise to pay money, usually recite the purpose of the issue and refer to the statute under which they are authorized, and contain recitals as to the authority of the officials who executed them and the regularity of the proceedings. Their security is in the governmental body issuing them and in the statute authorizing their issue and providing for their payment. Ordinarily they are issued to obtain funds to make improvements of a permanent nature, but may be authorized to fund a current indebtedness. They are issued for such terms as the statutes provide, usually 10, 20, 30, or 50 years, and are generally regarded as long-term obligations, but may be issued for shorter terms, or to mature in series from one year to ten, or twenty-five, or any other number. But "notes," maturing not later than two years, are authorized by our statute (R. S. 10-123) to be issued for certain purposes. These necessarily have the characteristics of municipal bonds, and are designated "notes" only because of their short maximum term.

The term "bond" is also applied to certain evidence of indebtedness issued by corporations. (See R. S. 17-610, 17-619, 17-1201, 52-606, 66-505, and other sections.) "Bonds" may be issued by partnerships, or by individuals. (See *In re Leland,* Fed. Cas. No. 8229; Daniel on Negotiable Instruments, 2d ed., §§ 1487, 1495; Jones on Corporate Bonds and Mortgages, 3d ed., § 230; 4 Elliott on Contracts, § 3580; Heft on Holders of Railroad Bonds and Notes; Dewing on The Financial Policy of Corporations; Chamberlain on Principles of Bond Investment; *Osborne v. Missouri, K. & T. Ry. Co.,* 155 N. Y. S. 236; *Brown v. Farm Mortgage Co.,* 112 Kan. 192, 210

Pac. 658.) The instruments issued may be called debentures, or debenture bonds (17 C. J. 1368), or by some other name (Bouvier's Law Dict. p. 376). But corporations, partnerships and individuals may also issue notes as evidence of indebtedness. At times the words "bonds" and "notes" are used without much discrimination; that is, one issue may by the maker be called bonds, another similar issue, by another, or even the same maker, may be called notes. Sometimes the term for which the instruments are issued has a bearing upon the name given to them. If they are issued for a short term they are more likely to be called notes; if issued for a long term they are more likely to be called bonds. But there is no definite rule about it; bonds may be issued for as short a time as one year, and instruments called notes may be issued for as long a term as ten or fifteen years or more. Yet we must determine whether the instruments in question are notes, as they are called, or whether they are bonds. More accurately, we must interpret our statute (Laws 1925, ch. 85), as applied to the instruments in question and determine whether they should be classified, under our statute, as notes or as bonds. The name given the instruments by the makers is not controlling. (*In re Fechheimer Fishel Co.*, 212 Fed. 357.) Which they are must be determined from the provisions of the instruments. It seems clear, by considering the several provisions of the statute, in conferring on banking corporations authority "to carry on the business . . . of discounting negotiable notes and of notes not negotiable," the legislature used the word "notes" as applying to the ordinary promissory notes used in the business affairs of our people. Such a note is an unconditional written promise signed by the maker to pay on demand, or at some future fixed or determinable date, a certain sum in money to the bearer, or to a person named therein, or to such person or order. It may contain provisions respecting interest, place of payment, etc. Default consists in nonpayment, and the holder may then sue. The authority of the bank to discount it does not depend upon whether it is negotiable or nonnegotiable— hence, the definition of negotiable instruments in our negotiable-instrument law is not controlling. The instruments before us contain much more than is necessary in notes. They recite the authority of the maker, the terms under which they are issued, refer to other instruments by which they are limited and must be interpreted, specific events of default are enumerated, and the rights of the

holder in the event of default depend in part upon whether there is default, and to what extent, to holders of other instruments of the series, and the right of a holder to sue in case of default is limited by the rights or duties of the trustee, and whether or not the trustee performs his duties, provisions for redemption before maturity, and many other provisions not common in instruments we know in the business world as notes. These provisions are common to bonds issued by corporations, partnerships or individuals engaged in business. (See general authorities above cited, also Fletcher's Corporation Forms, pp. 1277, 1358, 1382 *et seq.*) We have no hesitancy in classifying the instruments here in question as bonds. They are not notes within the meaning of our statute.

Passing to the next question: If the instruments in question are bonds, are Kansas state banks, under our statute (Laws 1925, ch. 85), prohibited from investing their assets therein? This question must be answered in the affirmative. Plaintiff is a banking corporation, organized, existing and doing business under and by virtue of our statutes. The statutory designations of the kinds of business it can do are grants of authority, and constitute its express powers. It has implied authority to do all things necessary or proper, incidental to these statutory grants of authority; these constitute its implied powers. But it has no authority to transact business not expressly granted by statute, or implied therefrom. (Magee on Banks and Banking, 3d ed., p. 231; Michie on Banks and Banking, p. 648; 3 R. C. L. 419.) Plaintiff calls attention to the wording of its charter, which includes "and may do a general banking business." We need not stop to inquire whether that is a broader term than "banking corporation" as used in the statute, for a bank organized under and existing under a general banking law finds its powers in the statute rather than in the wording of its charter. (7 C. J. 586.) Our statute outlines the nature of business permitted by a banking corporation, and thereby defines the general banking business of state banks in this state. The wording of plaintiff's charter, in other respects, does not enlarge its authority under the statute.

Plaintiff has no authority to do business of a kind or character not authorized, either expressly or by implication, by statute. The legislature dealt with the subject of the kinds of bonds a state bank is permitted to buy and sell, and omitted to authorize the buying

and selling of the bonds of corporations, partnerships and individuals engaged in the industries. Hence, this power is necessarily excluded. In *Talmage v. Pell,* 7. N. Y. 328, under a statute expressly empowering banks to deal in certain property, among which state bonds are not mentioned, it was held the bank had no power to buy state bonds. (See, also, *The Mount Vernon Bank v. Porter,* 52 Mo. App. 244.)

Appellant calls our attention to the fact that many real-estate loans are evidenced by instruments called bonds, with interest coupons attached, and suggests that the conclusion here reached would make it illegal for state banks to buy or sell, or invest their assets in real-estate bonds. This suggestion is erroneous, for, under the statute (Laws 1925, ch. 85), banking corporations are permitted to carry on the business "of loaning money on real estate." It is, therefore, not material whether the instrument which evidences such a loan is a note or a bond.

Some minor questions are argued, but we do not deem it necessary to discuss them. The judgment of the court below is affirmed.