No. 30,251.

THE STATE OF KANSAS, ex rel. ROLAND BOYNTON, Attorney-general, *Plaintiff,* v. THE WHEAT FARMING COMPANY, *Defendant.*

No. 30,252.

THE STATE OF KANSAS, ex rel. ROLAND BOYNTON, Attorney-general, *Plaintiff,* v. THE SLEDD FARM CORPORATION, *Defendant.*

(22 P. 2d 1093.)

Opinion filed June 10, 1933.

*Roland Boynton,* attorney-general, *R. O. Mason,* special assistant attorney-general, and *Dunkin Kimble,* assistant attorney-general, for the plaintiff; *W. L. Cunningham,* of Arkansas City, of counsel.

*Fred Robertson, E. M. Boddington, J. O. Emerson,* all of Kansas City, *Robert Stone,* of Topeka, *E. H. Benson,* of Colby, *E. C. Flood* and *Henry Herrman,* both of Hays, for defendant Wheat Farming Company; *Ben Jones* and *L. E. Quinlan,* both of Lyons, for defendant Sledd Farm Corporation.

The opinion of the court was delivered by

THIELE, J.: These are actions brought in this court by the state to oust the above-named defendants as corporations within the state of Kansas.

The petitions are similar and charge due and legal incorporation for the following purposes, to wit:

(*a*) The Wheat Farming Company on September 3, 1927, for: (1) The encouragement of agriculture and horticulture. (2) The improvement of the breed of domestic animals by importation, sale or otherwise. (3) The promotion of immigration. (4) The erection and maintenance of market houses and market places. (5) The conversion and disposal of agricultural products by means of mills, elevators, markets and stores and otherwise. (6) The erection of buildings and the purchase and sale of such real estate and real-estate products as may be incidental to the full performance of the purpose of this corporation as a farming company.

(*b*) The Sledd Farm Corporation on December 22, 1925, for: (1) The encouragement of agriculture and horticulture. (2) The construction and maintenance of dams and canals for the purpose of irrigation.

In each case it is alleged that the corporation has been and is abusing its power and exercising powers not conferred upon it by law, viz.: producing, planting, harvesting and gathering and selling for profit, and for profit alone, wheat, corn, barley, etc.

In the Wheat Farming Company's case, the following is alleged:

"Your relator further alleges and says that the organization of said defendant company has been continued solely upon the theory of its engaging in the business of farming for profit, and said defendant has been and is now

selling stock to the public, offering, as the sole inducement for said sales, great profit to be derived in corporation farming, and that said corporation is not now, nor has it been, engaged in scientific research, experimental farming or any other work for the encouragement of agriculture or horticulture save and except such work as may have been incidental to its own operation as a farm corporation for profit and to further its own financial interests and those of its officers, directors, servants, agents and employees, and that said defendant has bought up and now owns in the state of Kansas enormous tracts of land, the exact area of which is to this plaintiff unknown, but is to the defendant well known, and now has enormous land holdings in the state of Kansas, which said land is far more in area than is adequate or necessary for the defendant to use in its legitimate business in encouraging agriculture and horticulture, and that all of said land now held by the defendant as aforesaid is held for the sole purpose of commercial farming.

"Your relator further alleges and says that the defendant has purchased and now holds a great quantity of farm equipment, farm implements and farm machinery, which is far more in quantity than is necessary for the encouragement of agriculture and horticulture and that said equipment, machinery and implements are not now being used for the encouragement of agriculture and horticulture.

"Your relator further alleges that said defendant, the Wheat Farming Company, has practically abandoned its corporate franchises, privileges, purposes and functions."

And in the Sledd case, with appropriate change of name, almost identical allegations are made. Copies of the charter granted and amendments thereto are attached as exhibits in each case.

The Wheat Farming Company filed an answer containing forty paragraphs, which are summarized as follows: Admission of incorporation, of producing the crops mentioned, and that it has lands and implements; alleging that it was organized for the purpose of showing by experimentation and demonstration how farming, especially in grains, could be made profitable instead of unprofitable, as it had been, and in carrying out its purposes had only gotten fairly started; that it is incorporated for fifty years and, if permitted to pursue its activities, will continue to show by means and methods promulgated by it how agriculture in western Kansas can be changed from nonprofit to profit; that among the things done and to be done are actual demonstration of discoveries of experiment stations, operation of large units with modern machinery and equipment, scientific study of weather and soil and their relation to productivity, improvement and adaptation of seed, seed treatment and development of agricultural experts; that the advancement of the company and its accomplishments had encouraged the adoption of its methods by others to their benefit; that the company owns

market houses, elevators, buildings and real estate, and buys and sells agricultural products; that the counties in which it operates since it began have increased in population; that it owns 64,000 acres of land in seven counties; that the charter board of the state of Kansas knew 'it was intending to engage in business for profit and that other companies were chartered for similar businesses before and after it was chartered, and that licenses for the sale of stock in such corporations have been granted and thousands of Kansas citizens have invested millions of dollars in the stock of such companies; that on January 5, 1928, by the action of the charter board, the capital stock was changed from $150,000 divided into 1,500 shares of $100 each to 150,000 shares of no par value, and on January 18, 1928, the capital was changed to 150,000 shares of common stock of no par value and 3,000 shares of preferred stock of $100 par value, and on October 8, 1930, the common capital stock was increased to 300,000 shares of no par value, and that in connection therewith all requisite fees were paid; that the corporation fees and blue-sky permit fees amounting to several thousands of dollars were paid; that *ad valorem* taxes for the years 1928, 1929 and 1930, approximating $30,000, have been paid; that in pursuance of authority granted, over 100,000 shares of common stock and preferred stock to the amount of $300,000 to over 1,100 different persons, and approximating $2,000,000, had been sold. The history of certain bills introduced in the legislature is detailed and many other allegations are made which need not be noticed here but will be referred to as occasion demands.

The Sledd Farm Corporation filed an answer admitting its incorporation and alleging that its application for and the charter granted to it set forth that it is organized for profit and that the purposes for which it is formed are:

"Farming land under irrigation. The encouragement of agriculture and horticulture. The construction and maintenance of dams and canals for purposes of irrigation. The erection and maintenance of such buildings necessary for a general farming business. The purchase and maintenance of machinery necessary to carry on a general farming business and the doing of all things necessary and incidental thereto."

At the time of its incorporation the capital stock was $50,000; on October 2, 1928, the capital stock was increased to $100,000; on April 9, 1929, the capital stock was increased to $200,000; on September 19, 1929, the capital stock was increased to $600,000, and on May 13, 1930, it was increased to $1,750,000, the requisite fees being

paid to the state. The answer further alleges that the charter board is established for the purpose of making investigation of applications for charters and to determine whether the business proposed to be engaged in is one for which a corporation may be formed, and that no provision is made by law for the review of its decisions, and, therefore, this court is without jurisdiction in this matter. It also alleges that many other similar corporations have been chartered, that they have filed reports as required by law and have paid to the state thousands of dollars in taxes, fees, etc.; that before it sold its shares of stock it complied with the laws of Kansas, and that its books and records have been examined by the bank commissioner. It further alleges that the legislature of Kansas has recognized the extent and validity of the corporations by the enactment of certain statutes which will be hereafter referred to; that the legislature has been in session many times and has made no changes in the general corporation laws with reference to similar corporations until 1931, and the history of certain bills offered for enactment is set forth. It is further alleged that its operations are carried on in western Kansas by experimentation, and by the adoption of modern methods it has been able to farm land and produce crops, especially wheat; that it owns 5,000 acres in Kearny county and 3,000 acres in Hamilton county, and that as a result of its efforts and demonstration other persons in the proximity of its land have been encouraged to cultivate their lands in like manner; that it has experimented with different kinds of farming machinery and equipment and has demonstrated the value and practicability of certain machinery and farming operations; that it has conducted soil experiments and experiments with different kinds of seed, and that individual landowners have adopted to their own use and benefit the means and methods used by the defendant, and that it encourages the leasing and renting of its lands to private persons who are ready and willing to farm the same according to its methods. It is further alleged that it now has a paid-up capital of $1,122,600; that its shareholders are residents of forty-one different states and number 1,967; that the ouster of defendant would cause irreparable loss and injury to many persons; that the legislature of Kansas has recognized that defendant and similar corporations might be legally incorporated and carry on business such as the defendant is engaged in and by reason thereof many persons had purchased shares of stock in this and other similar companies and would not have done

so except for the decision, opinion and judgment of duly constituted officers of this state and the recognition by the legislature of the validity of the corporation; that the legislature, by action and inaction, has recognized that upon principles of equity and good faith defendant and others similarly situated should not be forced to liquidate with resultant loss to shareholders, and that the state has waived any right it may have had to maintain the action; that the legislature of Kansas, by its various actions and inactions, has recognized the validity of the incorporation and business of the defendant and other similar corporations but has manifested an intention that no further incorporations of such nature will be permitted, and by reason thereof the plaintiff is estopped to maintain this action.

To these answers the state has filed replies putting in issue the matters presented by the answers.

Prior to the trial in each case certain facts were admitted by stipulation and testimony was taken with respect to other matters in controversy. As might be expected in an action of this kind, the inquiry was not limited by the commissioner who heard the case, and much testimony was taken, the materiality or relevancy of which is somewhat difficult to discern. Both plaintiff and defendant filed requests or suggestions for findings of fact and conclusions of law. At the conclusion the commissioner made findings of fact in each case.

In so far as the Wheat Farming Company is concerned the findings may be summarized as follows: The company was chartered February 3, 1927, for the purposes charged in the petition, and the charter was thereafter amended with respect to the capital stock as hereinbefore shown. On February 27, 1928, the company filed its application with the bank commissioner for permission to sell both common and preferred stock. Thereafter other applications were made, and since the organization of the defendant company it has sold common stock in the amount of $2,428,418.90 and preferred stock to the amount of $300,000. There are over 1,200 stockholders, most of them residents of Kansas and over seventy per cent of them farmers. The defendant is not and has not been engaged in the improvement of the breed of domestic animals by importation, sale or otherwise, nor in the promotion of immigration, nor has it been engaged chiefly in the erection of market houses, although it does own four elevators which are maintained chiefly for its own use, although

they are open to the public generally. The fourth finding of fact is as follows:

"That ever since its incorporation the defendant has been and is now engaged in the general farming business for profit, planting, raising, producing, gathering and selling wheat, corn, barley, oats, rye and other agricultural products, and in conducting said general farming business it has acquired from time to time various tracts of land until it now owns about 64,000 acres of land, located chiefly in the counties heretofore named, and has also acquired and now owns and uses in its business machinery and equipment to the amount or value of about $234,000, as shown by its quarterly report of March 31, 1931. That said business of general farming is now and has been ever since its organization the chief or main business of said defendant, and the chief and principal object of the defendant in its operations as a farming company is and has been to realize profit for its stockholders."

The fifth is as follows:

"That the defendant, in carrying out its business of farming for profit, has sought, by actual investment and experiment and practice, to put in use the newest discoveries in agriculture, to the end that agricultural production may be increased to the fullest extent possible and the cost thereof reduced to the lowest point, and in so doing has used the following specific procedures, among others:

"(a) The use of bookkeeping and cost systems in farming. (b) Extensive use of power. (c) Preparation of the soil and treatment of seed according to tested and approved methods. (d) Fallowing and weed destruction. (e) Moisture conservation and the use of the moisture tests. (f) Use of newest methods in harvesting and seed-bed preparation, and smut treatment. (g) Elimination of Hessian fly damage through observance of fly-free date of seeding. (h) Working out of maximum economic unit one foreman can manage. (i) Farm to factory engineering, consisting of correspondence with factories and obtaining needed changes in farm machinery. (j) Economies through use of the one-way plow in breaking sod. (k) Use of the combine for harvesting sorghum. (l) Use of the dumb-box sorghum harvesting, invented by the Wheat Farming Company. (m) Use of big hitches for power and labor economies. (n) Elimination of cultivation of row crops by use of deep-furrow drill. (o) Construction of line of elevators. (p) Saving on trucking by working out a definite cost record for that class of service. (q) Development of unit farming. (r) Donation of milo seed for tests among farmers."

The commissioner further found that a large portion of the land acquired by defendant had not previously been farmed; that it was level land, as that was the only kind suitable for plaintiff's operation; that where occupied lands were purchased, the dwelling houses would frequently be removed; that it was not the policy of the company to rent any part of its land except isolated small tracts, and that the investment in lands, as reported to the blue-sky de-

partment on March 31, 1931, was $1,861,083.19, and it owed mortgages thereon of $263,593.18; that the defendant company organized and owns all of the stock of the Hays Tractor and Equipment Company, which latter company handles and sells at retail farm and road machinery and equipment; that the company owns 64,453 acres situated in Ellis, Rooks, Trego, Graham, Gove, Sheridan, Logan, Thomas, Wallace and Sherman counties; that there have been at least eighty-six corporations either formed or admitted to do business in the state of Kansas, as corporations for profit, the purposes for which they were formed being similar to the purposes of the Wheat Farming Company; that each of said corporations has paid the fees required by the laws of Kansas, and thousands of citizens in Kansas have invested in the capital stock and securities of such corporations; that at the granting of the charter of the Wheat Farming Company and on the approval of all amendments thereto there was no dissent by any member of the charter board; that approximately thirty of the eighty-six corporations referred to are in existence at this time engaged in agricultural and farming activities; that since 1926 there has been a pronounced movement whereby farms in that region of Kansas wherein the defendant company operates have become and are still rapidly becoming of larger acreage than heretofore; that the organizers of the defendant company, and particularly its president, are men who have taken an interest in agriculture for a number of years, are possessed of much information and knowledge covering the subject, and have generally utilized the knowledge and information, as well as their own experiences and experiments, and the defendant company has given to the public the information acquired and possessed by it as a result of its operations; many publications, pamphlets and newspaper articles have been written and distributed, and meetings were held attended by employees of the defendant company and to which the public generally was invited, at which the operations of the company and its methods and business generally were discussed. There are also findings with respect to the quantity of grain produced by the defendant company and its cost per acre dependent on the size of the field. It was also found:

"The fourth subdivision of section 17-202 of the Statutes of Kansas, 'the encouragement of agriculture and horticulture,' has been a part of the corporation statute of this state ever since 1868, and from time to time until the passage of the law creating the charter board in 1898, many corporations were chartered under this provision for the purpose of farming for profit. Be-

ginning with 1899, after the charter board was created and up to 1931, many applications· for charters for corporations, whose ·purpose it was to engage in farming for profit, were presented to and granted by the charter board, and the various officers who composed said charter board to whom such applications were presented, and those whose duty it was to pass upon the same, always construed and interpreted the said provision in the corporation law as authorizing the creation of corporations for the purpose of farming for profit; and during all this time there was a continuous and uninterrupted administrative construction and interpretation of the said provision of the corporation law to the effect that it authorized the creation of corporations for the purpose of farming for profit; and the fact that corporate charters had been granted for such purpose was known to the legislature of this state at least for a number of years prior to the granting of the charter to the defendant company.

"Although farming corporations have been created and in existence since as far back as 1880, there is no evidence that any department or officer of the state of Kansas ever questioned the validity of any charter issued to a corporation for the purpose of engaging in farming for profit or ever questioned the right of any corporation to engage in the business of farming for profit, until the year 1931.

"That at the time the charter was granted to the defendant company the charter board knew that the purpose of the proposed corporation was to engage in farming for profit.

"Under the evidence in this case, the facts disclosed are sufficient to create an estoppel against the state and are sufficient to and do make out the defense of laches and estoppel, as pleaded in the answer, if it should be held as a matter of law that the doctrine of laches or estoppel may be invoked as against the state.

"The fact· that the defendant corporation is engaged in farming for profit does not constitute a public menace nor does it effect any injury whatever to the public, and the public interest would not be subserved by granting the writ of ouster.

"If the writ of ouster should be granted it would cause a great depreciation in the value of the property and assets of the defendant company as a going concern and would cause a corresponding loss to the defendant and its stockholders."

The commissioner concluded, as a matter of law, that if there was any ambiguity in R. S. 17-202, in the light of a continuous and uninterrupted construction, an interpretation placed on it by. the various officers and departments of Kansas authorized the granting of the charter to the defendant company and that the charter board in granting the charter must be deemed to have found that the business in which the company proposed to engage would in fact be an encouragement of agriculture within the meaning of R. S. 17-202, subdivision 4; that the defendant, as a matter of law, may not in-

voke the doctrine of laches and estoppel, but that the fact which would make out such a defense may be taken into consideration in determining whether a writ of ouster should or should not be granted, and that, in his opinion, the discretion of the court should be exercised against the issuance of a writ.

In so far as the Sledd Farm Corporation is concerned, many of the facts were stipulated and evidence was taken as to matters in dispute. The commissioner made findings of fact with respect to the charter and the authorized capital in line with the allegations of the petition and answer and further found that in a little over three years' time the outstanding capital stock of the company increased from $37,000 to $1,123,500, and that it acquired and owned approximately 20,000 acres of land located in Finney, Gray, Greeley, Seward, Grant, Wallace, Osborne, Lane, Hamilton, Kearny and Rice counties, and:

"That since its incorporation the defendant has been and is now engaged in the general farming business for profit, producing, planting, raising and selling wheat, corn and other grain and farm products generally, and for the purpose of conducting said general farming operations it has acquired from time to time various tracts of land in amounts and location as heretofore found; and has also acquired and uses in its farming operations a considerable amount of machinery and equipment. That said business of general farming has been and is now the chief or main business of said defendant, and the chief and principal object of the defendant in its operations has been and is to realize profit for its stockholders.

"A part of the land acquired by the defendant was land which had previously been cultivated, but the far greater part of the land it acquired was sod land that had never been cultivated. The evidence shows that after the company acquired the land some of the improvements on one tract, namely, one house, an elevator, a chicken house and fences, were removed, and there were left on this tract of land a house, granary, chicken house, windmill, barn and storage tank.

"In the year 1931 the defendant rented about 3,000 acres belonging to other landowners who desired that the defendant break the land and sow it to wheat, and this was done. During the years 1930 and 1931 the defendant also rented to others a considerable acreage of its own land, one of the purposes being, as expressed in the letter of Mr. Sledd to the state banking department, dated July 19, 1930, 'to off-set any unfavorable public opinion that the people have in regard to the Farm Corporation;'"

and made findings with respect to other corporations engaging in like business in Kansas similar to those found in the Wheat Farming case, and made conclusions of law as in the Wheat Farming case.

The plaintiff has filed its exceptions to the reports of the commis-

sioner in both cases, which will not be specifically treated. An examination of the record, apart from the commissioner's findings, supports a general finding that the allegations of the plaintiff's petitions, as hereinbefore noted, are true.

It may be remarked here that the charter of the Wheat Farming Company in its statement of purposes includes subdivisions (4), (31), (33), (36) and (39) of R. S. 1931 Supp. 17-202, but there is no showing that it has done anything to improve the breed of domestic animals or to promote immigration. On the contrary, the evidence shows that its principal activities have been, as its name implies, the raising of wheat and taking care of it, and the selling of stock to raise funds to enable it to pursue its business. The charter of the Sledd Farm Corporation includes subdivisions (4) and (37) of the above statute, farming land under irrigation, and the erection and maintenance of buildings, and purchase and maintenance of machinery necessary to carry on a general farming business, but the evidence shows that it has not engaged in building any dams. A corporation for farming land under irrigation is not authorized by the statute, and the erection of buildings and purchase of machinery are incidental to the encouragement of agriculture within the meaning of that statutory purpose. The evidence shows that its activities have been confined to general farming and the selling of stock to raise funds to pursue its business. While there may be collateral questions involved, it is apparent that the solution of one question is decisive in these cases, and that is: Can a corporation organized for the purpose of "the encouragement of agriculture and horticulture" engage in a general farming business for profit as its principal business? or, put in another form, Does the statute authorize the formation of a corporation whose principal business shall be general farming for profit?

The parties differ on the meaning of the statutory phrase, "the encouragement of agriculture and horticulture," but they do agree on defining the meaning of the component words. In so far as the word "encouragement" is concerned, all authorities consulted give substantially this definition: "To help, to forward, to give courage to, to inspire with courage, spirit or hope." In so far as the word "agriculture" is concerned, we are inclined to give a more complete definition than either of the parties, viz.: "The cultivation of the ground; especially, cultivation with the plow and in large areas to raise food for man and beast, tillage; farming. Theoretical agri-

culture, or the theory of agriculture, is a science comprehending in its scope the nature and properties of soils, the different sorts of plants and seeds fitted for them, the composition and qualities of manures, and the rotation of crops, and involving a knowledge of chemistry, geology, and kindred sciences. Practical agriculture, or husbandry, is an art comprehending all the labors of the field and of the farmyard, such as preparing the land for the reception of the seeds or plants, sowing and planting, rearing and gathering the crops, care of fruit trees and domestic animals, disposition of products, etc." (See Century Dictionary.) The same work defines horticulture as "The cultivation of a garden; the art of cultivating or managing gardens. The ordinary productions of horticulture are generally classed under the three heads of fruits, flowers and vegetables, which on a large scale are cultivated separately, but in small gardens are more or less combined." There is no ambiguity in the statute itself, the contention between the parties is rather as to whether certain operations, about which there is not much dispute, are for the encouragement of agriculture or otherwise.

In its last analysis the contention centers around the application of the word "encouragement" and whether, under the statute and charter, the conceded operations of the defendants were for the encouragement of agriculture or for the advancement of the interest of the stockholders. The question has been exhaustively briefed by both parties, and reference in detail to the many instances cited in the briefs of the use of the term "encouragement" in statutes of many states, in charters granted by legislatures, and in grants by the crown in England is forbidden by the limits of time and space. It will have to suffice here to say that examination of many of these statutes and grants shows that while the word "encouragement" is used in them there follows a grant of power to do certain things, the powers in some cases being broad and in others narrow.

The state makes a contention, based on the arrangement of the statute, that private corporations are of three kinds: 1, for religion; 2, for charity or benevolence; 3, for profit (R. S. 17-103), and that in stating purposes (R. S. 1931 Supp. 17-202) the same arrangement is and was intended and, therefore, a private corporation whose purpose is the encouragement of agriculture is one having characteristics of charity and benevolence and cannot be for profit. We do not agree. A private corporation to teach the science of agriculture might be formed and derive some profit from its operation; so might

a corporation to promote an agricultural fair, and the legislature in providing for a corporation for the encouragement of any learned profession recognized that it might be for profit. (R. S. 17-204.) But profit is not the test. Under the statute last mentioned a private corporation might be formed of lawyers ostensibly to conduct a law school at a profit, but it would not follow (ignoring for the moment other disabilities) that it could practice law at a profit and claim that it had devised new methods of office practice, accounting, specialization of work, etc., at greater profit than realized by others and thus encouraged the profession.

The evidence shows that the Wheat Farming Company has acquired over 60,000 acres of land; has sold stock for over $2,700,000 to be used in its operations; that of this amount over $1,850,000 has been expended for lands and over $500,000 has been used for organization and promotion; that it produced in 1931 over 600,000 bushels of wheat; has invested over $230,000 in machinery; has spent over $100,000 in acquiring elevators; has, by reason of its operations and methods, been able to lower the cost per acre for production; has made some experiments with relation to types of crops to be grown, and that publicity has been given to its activities and successes. It is impossible to say just how much was spent by the company for educational purposes, as distinguished from advertising for the purpose of selling stock, etc., but the amount was negligible when compared with promotion and organization expense. It is not necessary to reproduce any of the many exhibits offered, but the same show that the company advertised its success in glowing terms and offered the investing public the opportunity to get in on what it professed was a business venture with an assured success. Much publicity was given to the earnings and dividends.

In so far as the Sledd Farm Corporation is concerned the evidence showed it had sold stock for over $1,222,000 and had acquired over 20,000 acres of land; that it leased other lands for its own operations and leased some of its own lands to tenants. At least so far as abstracted, most of its testimony was offered to show the history of granting charters by the state, which matter is hereafter discussed.

From the showing made the state argues, among other things, that the main and principal business of the defendant corporations is farming, and that the business has been so conducted that if there is any "encouragement" of agriculture it is negligible; the defendants

call attention to the many farm operations, as shown in the commissioner's findings, and argue that their successful operations, in connection with the publicity which has been given, have and do encourage agriculture. One would have the encouragement objective, the other subjective.

While undoubtedly evidence of successful operation in any industry or calling might induce others to enter, and successful conduct might induce others in the same line to change methods, it would not necessarily follow that the conduct of those first successful was for the purpose of inducing others to be successful. Example is not always encouragement, and neither are protestations as to motive of much consequence; the course of conduct must be traced. It clearly appears that the activities of these corporations have been concentrated on building up a huge business venture, and from the record we can come to only one conclusion, and that is that the purpose of these corporations is and has been to make profits and pay dividends to the shareholders; if there has been any encouragement to agriculture in it, it has been incidental and not in any sense a primary purpose. Putting aside for the moment other phases of the problem before us, we have no difficulty in arriving at the conclusion that the statute does not authorize the formation of a corporation to engage in a general farming business for the purpose of profit, and that, regardless of the statement of purposes in their respective charters that they are formed to encourage agriculture, the defendants have not been and are not so doing.

It is urged, however, even if that be true, the state has recognized that, under the purpose phrase in question, a corporation may be formed to conduct a general farming business; that many charters have been so granted; that the charter board knew when the charters were granted that the proposed corporation intended to conduct a general farming business and that the legislature in enacting chapter 153 of the Laws of 1931 (R. S. 1931 Supp. 17-202a) had recognized such course of construction, interpretation and administration of the law.

Prior to 1898 the method of procuring a charter was materially different than since. The charter board was then created (Laws 1898, ch. 10) and required to make a careful investigation of each application and to inquire especially with reference to the character of the business in which the proposed corporation is to engage, and if it determined that the business is one for which a corporation

may lawfully be formed, to grant the charter. Much testimony was taken with reference to farming corporations whose charters were granted before and after 1897, and with reference to what the charter board did in the way of determining the character of the business which the proposed corporation intended to engage in and conduct. It must be conceded and assumed, however, that when any charter was granted it was intended only to grant a lawful charter, and that the corporation proposed only to engage in that business in which, under the statute, it had a right to engage. The charter board's powers were fixed by statute, and they could only be exercised in connection with a lawful purpose, and neither the board nor the corporation could extend or enlarge either the purposes for which a corporation could be formed or the powers of the corporation. Since 1898 charters have been granted to a considerable number of corporations and, while not absolutely true, in most instances, in addition to other purposes, has been the stated purpose to encourage agriculture, and, under such charters, the corporations have engaged in general farming operations without any objection being raised by the state that such operations were beyond the charter purpose and, therefore, power of the corporation. Within the past few years, however, some of these corporations, evidently taking note of the financing ventures of other corporations, have embarked on a financing scheme marked by sales of stock, and in these cases the evidence shows that while general farming operations have been carried on, so have campaigns for sale of preferred and common stock. These activities became of such magnitude and of so great publicity that the attorney-general was directed by resolution of the house of representatives of the state legislature to institute this action. It might be remarked here that this is some evidence of legislative intent. Defendants argue that by reason of the fact that the charter board, when granting the charters, was aware that the companies proposed to engage in general farming on a large scale, and later that when capital stocks were increased and blue-sky permits to sell stock were granted, a course of interpretation and construction of the statute was inaugurated and thereafter continued by the executive and administrative authorities; that by reason of legislative inaction in part and by the enactment of R. S. 44-301 and R. S. 1931 Supp. 17-202a, the legislature has tacitly approved such construction and interpretation, and that the state is now precluded from bringing these proceedings, and in support

cite the following: *Harrison v. Benefit Society*, 61 Kan. 134, 59 Pac. 266; *State v. Shawnee County*, 83 Kan. 199, 110 Pac. 92; *Cavlovic v. Baker*, 118 Kan. 412, 234 Pac. 1009; *Citizens Bank v. State Tax Comm.*, 132 Kan. 5, 294 Pac. 940; *State, ex rel., v. State Highway Comm.*, 132 Kan. 327, 295 Pac. 986; *National Lead Co. v. United States*, 252 U. S. 140, 64 L. Ed. 497; *Poe v. Seaborn*, 282 U. S. 101, 75 L. Ed. 239; and 25 R. C. L. 1042; and our attention is directed to *United States v. Dakota Montana Oil Co.*, decided March 13, 1933, wherein appears the following:

"The administrative construction must be deemed to have received legislative approval by the reënactment of the statutory provision without material change." (77 L. Ed. 585, 589.)

An examination will disclose, however, that the rule applies only where the statute is either ambiguous, or where by its terms it does not fully cover the field. It is stated in 59 C. J. 1022 that where the language of a statute is ambiguous or uncertain the construction placed upon it by contemporaries, although not controlling, may be resorted to as an aid in ascertaining legislative intent, but is unnecessary and improper where the language used is clear, and that under that principle a course of conduct indicating a particular understanding of a statute will frequently be of great value in determining its real meaning, especially where long continued.

"A practicable construction of a statute is not conclusive on the courts, but if unvarying for a long period of time it should be disregarded only for the most cogent reasons. The doctrine arises only from a course of conduct, and is never applied to a single case. Moreover, no matter how long the usage has been established, or how general the acquiescence in the customary construction, it will not be permitted to override the plain meaning of a statute, nor will the rule of practicable construction apply where the ambiguity is merely captious and not serious enough to raise a reasonable doubt in a fair mind reflecting honestly on the subject." (59 C. J. 1024.)

In *Swift Co. v. United States*, 105 U. S. 691, 26 L. Ed. 1108, it was said:

"The rule which gives determining weight to contemporaneous construction, put upon a statute by those charged with its execution, applies only in cases of ambiguity and doubt." (Citing cases.) (p. 695.)

In discussing the rule of contemporaneous construction, it is said in 25 R. C. L. 1043:

"The rule now under consideration has, however, no application unless the construction is a doubtful one and the ambiguity which arises from the language is so great as to compel the court to seize upon extraneous circumstances to aid in reaching a conclusion."

The same authority, discussing executive or departmental construction, says, in part:

"Since executive or departmental construction can only be resorted to in aid of interpretation, it is the general rule that such construction is not controlling where the statute is clear and explicit in its language, and its meaning is not doubtful, and an executive or departmental construction of a proviso to an act which makes the proviso plainly repugnant to the body of the act is inadmissible. A custom of a department, however long continued by successive officers, must yield to the positive language of the statute." (p. 1046.)

In *Railway Co. v. Cowley County*, 103 Kan. 681, 685, 176 Pac. 99, it was said:

"The rules of statutory construction are not rules restricting the power of the legislature in passing laws: they are rules observed by the courts in trying to ascertain what the legislature intended by the laws that have been passed."

And in the same case the rule was approved that "the cardinal canon of construction, to which all mere rules of interpretation are subordinate, is that the intent, when ascertained, governs." (See cases cited.)

And in *Alter v. Johnson*, 127 Kan. 443, 272 Pac. 474, the first paragraph of the syllabus recites:

"A primary rule for the construction of a statute is to find the legislative intent from its language, and where the language used is plain and unambiguous and also appropriate to the obvious purpose the court should follow the intent as expressed by the words used and is not warranted in looking beyond them in search of some other legislative purpose or of extending the meaning beyond the plain terms of the act."

The second subdivision of R. S. 77-201 reads as follows:

"Words and phrases shall be construed according to the context and the approved usage of the language; but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in law shall be construed according to such peculiar and appropriate meaning."

The phrase "the encouragement of agriculture and horticulture" can hardly be said to be a technical phrase, or such as has acquired a peculiar and appropriate meaning in law, so we conclude it shall be construed according to the context and the approved usage of the language. The latter phase of construction has been heretofore discussed. As to the context, it will be noted that the phrase under consideration is numbered (4) in the statute R. S. 1931 Supp. 17-202. Those preceding it pertain to (1) public worship, (2) benevolent, etc., undertakings, (3) literary and scientific undertakings, maintenance of a library and promotion of fine arts; and

those immediately following are: (5) maintenance of public parks
for skating and other innocent sports, (6) club for social enjoy-
ment, (7) public or private cemetery. If context means anything,
the encouragement of agriculture was not considered by the legisla-
ture as being a business venture. We conclude that the phrase "en-
couragement of agriculture and horticulture" is composed of words
of ordinary and approved usage, not technical in any sense; that it
is not ambiguous, and therefore no resort should be had to any ad-
ministrative construction that might have been placed upon it. The
fact that members of the charter board may have misconceived the
meaning of the phrase does not and cannot have the effect of making
the statute mean something other than it plainly states, and, as has
heretofore been referred to, the purpose stated in the charter was in
the statutory language, and it must be assumed that everyone con-
cerned, the applicants as well as the members of the charter board,
intended that a charter be granted only for lawful purposes and that
the present activities of the corporation were not within contempla-
tion unless duly authorized by statute.

It is contended, especially by the Sledd Farm Corporation, that
this court is without jurisdiction, because whether defendant is en-
gaged in a business for which a corporation may be lawfully formed
is the identical question heretofore determined by the charter board,
and if the same is a judicial question now, it was when it was deter-
mined by the charter board, and is now *res judicata.* We shall not
discuss the contention further than to remark that the matters com-
plained of in these actions grow out of operations since the charters
were granted. The charter board could not create a corporation
for purposes other than set forth in the statute and could not en-
large the statutory powers of any corporation organized for a law-
ful purpose. See *Winslow v. Board of Dental Examiners,* 115 Kan.
450, 452, 223 Pac. 308, and *First State Bank v. Bone,* 122 Kan. 493,
503, 252 Pac. 250. And, in addition, special provision has been
made for this precise form of action when a corporation abuses or
exercises powers not conferred by law. Article 29 of chapter 80 of
the General Statutes of 1868, pertaining to proceedings in quo war-
ranto, read, in part:

"Fourth, where any corporation do or omit acts which amount to a sur-
render or a forfeiture of their rights and privileges as a corporation, or when
they exercise powers not conferred by law."

And the same provision, somewhat expanded, now appears as R. S.
60-1602, 4th subdivision. It is the duty of the court to see that a

corporation does not exercise powers beyond its charter. *Whetstone v. Ottawa University,* 13 Kan. 320, 338.

The contention heretofore referred to that the state is bound by something in the nature of estoppel is also without merit. In *State, ex rel., v. Paul and Grice,* 113 Kan. 412, 214 Pac. 425, it was said:

"This court has never given its sanction to any such doctrine. It is altogether out of accord with the theory of Kansas jurisprudence. Beginning with *Wood v. M. K. & T. Railway Co.,* 11 Kan. 323, 349, there is a long and undeviating line of decisions down to and including *In re Mosley's Estate,* 100 Kan. 495, 164 Pac. 1073, and *The State, ex rel., v. Piper,* 103 Kan. 794, 798, 176 Pac. 626, which hold that laches and estoppel do not operate against the state, that no procrastination of public officials prejudices the state and that their tardiness neither bars nor defeats the state from vindicating its sovereign rights, except where positive statutes so provide."

And see *City of Emporia v. Humphrey,* 132 Kan. 682, 693, 297 Pac. 712.

Complaint is made that actions are not brought against all companies which may be said to be similarly situated. Perhaps the attorney-general was of the opinion that the trial of these two suits would settle the controversial questions which would be involved in any disputes with other companies, and good judgment demanded that he prosecute one or two actions to a conclusion before proceeding against other offenders; but, whatever his motive, it is no defense to defendants here, and, for that matter, there is no evidence but that the attorney-general is proceeding against such other companies if any there be. See *Boynton v. Fox West Coast Theatres Corp.,* 60 F. 2d 851, 854.

A considerable space is given to a discussion of agriculture and public policy with reference thereto. We do not deem it necessary to enter into any discussion of agriculture with the idea of proving whether it is a means of making a livelihood, whether it is in the future to become a great business, or other matters of similar nature suggested. Neither are we here concerned with the question of the advisability of allowing corporations, or individuals, for that matter, to accumulate large holdings of lands to be used for agriculture or any other purpose. Our problem is to determine whether the defendant corporations have exceeded the purposes for which they were formed and have abused their corporate powers, and if so, to correct the wrongs which exist by reason thereof. Much is said in the briefs bearing on the proposition that these corporations have

been permitted to continue in existence, to acquire vast bodies of lands, and to sell their stocks so that now the holders thereof can be counted in the hundreds; that if ouster is granted it will have the effect of depriving these stockholders of their property, for the reason that an ouster will compel throwing on the market, at a time when real-estate values are already depressed, a large number of farms, and it is urged that even though the court find that ouster might be proper, that, in the exercise of its discretion, the situation should be viewed from the standpoint of the stockholders and the ouster denied.

Under the evidence it appears that there has been nonuser and lack of performance by the Wheat Farming Company of those purposes named in its charter having to do with improvement of the breed of domestic animals and the promotion of immigration, and by the Sledd Farm Corporation of the construction and maintenance of dams, and ouster to these extents is ordered.

The evidence also shows that the Wheat Farming Company organized and owns all the stock of a corporation engaged in sale of farm machinery, and it is ordered that it sell and dispose of the stock of such corporation.

We are of opinion that, under the evidence, it would be justifiable that a complete forfeiture of the charter of each defendant corporation be ordered and decreed, but are likewise of opinion that it is not necessary or expedient at this time that such an order and decree be entered. In so far as these actions are concerned, they are brought solely on the ground that the corporations are exceeding their statutory purposes and therefore powers, and not because of otherwise improper conduct of their affairs, although some evidence tending to show mismanagement was attempted to be offered. The court is likewise of opinion that these corporations should so arrange their affairs that within a reasonable period of time they will have disposed of all real estate and other property not necessary for use in the lawful exercise of the purpose for which they were created, and if it is impossible to so limit their respective activities, that they will liquidate their assets and dissolve their respective corporations. Jurisdiction of the cause is retained and if steps are not taken by the respective corporations in line with the above suggestions then, upon notice, the writ of ouster will issue and such further orders as may be necessary and expedient will be made.

SMITH, J., not participating.